UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SCOTT B.,                                    :
                    Plaintiff,               :
                                             :
            v.                               :        C.A. No. 21-481MSM
                                             :
KILOLO KIJAKAZI,                             :
Acting Commissioner of Social Security,      :
                    Defendant.               :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Plaintiff Scott B. alleges that he has been disabled since December 31, 2016, because of a

cholesteatoma in his left ear that has caused total deafness in that ear and was surgically removed

on March 10, 2020.  Although no medical provider or expert has opined that this impairment has

resulted in disabling limitations that persisted for at least a twelve-month period, Plaintiff claims

(1) that the deafness, vertigo, tinnitus and anxiety caused by the cholesteatoma have resulted in

the inability to walk at all without something to lean on or to walk for more than two minutes

before sitting or lying down, and (2) that he often struggles to hear even from the right ear

because of constant loud buzzing in the left.  Tr. 48, 54.  Based on these claims, Plaintiff applied

for Disability Insurance Benefits ("DIB") on November 8, 2019.  His application was denied by

the Acting Commissioner of Social Security ("Commissioner") based on the decision of an

administrative law judge ("ALJ").

Plaintiff has sued seeking reversal of this adverse decision.  In his motion, ECF No. 13,

Plaintiff alleges that the ALJ erred in discounting his subjective statements, in failing to assess

limitations consistent with those statements and in relying on a vocational expert ("VE") whose

testimony was based on job numbers in the Occupation Employment Quarterly ("OEQ").  He

also claims an egregious mistake by the Appeals Council in failing to consider additional medical records submitted after the ALJ's decision issued.  The Commissioner has filed a counter motion to affirm.  ECF No. 15.  The matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.  **Background**

Plaintiff is a "younger" individual whose education ended in the tenth grade.  Tr. 45.  He alleges that he became disabled on December 31, 2016.  Tr. 82.  From 2006 until April 2017 (that is, after the alleged onset date), he worked part time as a tree laborer, earning between $7,180 and $10,850 per year.  Tr. 46, 71, 158.  Plaintiff also pursued stock car racing as a serious hobby,[1] continuing into the period of alleged disability until September 2019.  Tr. 49, 52, 315.  Although Plaintiff's part-time work as a laborer continued after the alleged onset of disability, his earnings did not amount to a substantial gainful activity.  Tr. 27.

The earliest medical records are from 2015, prior to the alleged date of onset, when Plaintiff was working part time as a tree laborer and racing stock cars.  He was seen by an ear, nose and throat ("ENT") specialist whose notes reflect left side hearing loss for several years with low grade dizziness that waxed and waned; the diagnosis was chronic mastoiditis.  Tr. 242. Following a gap, the next treatment of record are annual physical examinations in September 2017 and September 2018, which reflect that Plaintiff "feels well" (2017) and has subjective back pain (2018), with no psychiatric symptoms.  Tr. 255-60.  Following another year-long gap, in September 2019, Plaintiff had a serious episode during which he collapsed at the racetrack, suffering from vertigo, dizziness and nausea.  Tr. 49; 75-76; 248-248.  He was hospitalized and discharged the next day with a diagnosis of vertigo.  Tr. 251.  After discharge, Plaintiff treated

---

[1] Plaintiff testified that he was a three-time champion and had been racing for eighteen years.  Tr. 51.

with Dr. Rachel Smith of Hawthorn Medical Associates, LLC.  See e.g., Tr. 49, 351-53.

Following this episode, Plaintiff did not race cars or work again.  Tr. 28, 51, 71, 79.

At the first appointment with Dr. Smith on September 25, 2019, Plaintiff was treated for a

tympanic membrane perforation and dizziness/vertigo with medication.  Tr.  275-77.  After the

infection resolved, Dr. Smith diagnosed a large cholesteatoma of the left middle ear and mastoid

although Plaintiff had no fatigue, no vertigo and no tinnitus.  Tr. 237-38; see Tr. 270 ("His

vertigo has resolved . . . no more vertigo").  On November 6, 2019, Dr. Smith completed a

medical verification form opining that Plaintiff needed surgery on the cholesteatoma and that

Plaintiff was mildly limited in standing and sitting, but significantly limited in walking,

climbing, pushing, bending and lifting.  Tr. 239-40.  Dr. Smith's opinion is expressly limited to

the period leading up to the surgery.  Tr. 241 ("unable to do current employment until after

surgery").

Plaintiff began treatment for his ear in late 2019 at Massachusetts Eye & Ear with Dr.

Alicia Quesnel and Dr. Elliott Kozin.  After a diagnostic CT and MRI, the record reflects that

Plaintiff had recently returned from a cruise during which he was quite dizzy; his balance was off

(tandem gait with difficulty/Fukuda stepping tests turns to left) while walking and he had no

hearing in the left ear.  Tr. 281-83.  For a treatment plan, Plaintiff was scheduled for surgery; the

notes reflect "very severe anxiety and nervousness surrounding his symptoms and the procedure"

with the recommendation that he follow up with his primary care provider to consider whether a

referral to a psychiatrist may be necessary.[2]  Tr. 285-86.  On January 13, 2020, Dr. Kozin noted

that Plaintiff's persistent imbalance was stable and that he had no vertigo and no change in

tinnitus.  Tr. 287-93.

---

[2] There is no record reference suggesting that a pre-surgery referral to a psychiatrist was deemed necessary.

The surgery was performed on March 10, 2020.  Tr. 326.  Plaintiff was discharged on March 11, 2020, with a recommendation for physical therapy.  Tr. 310-15.  A physical therapy consultation was performed the same day, resulting in the observation that Plaintiff was functioning "close to his recent baseline, though this is well below his independent functional baseline prior to September" and that anxiety may be a barrier to progress.  Tr. 315.  The focus of physical therapy was to improve ambulation and balance and "to reduce fatigue, anxiety, and depression and improve physical function and quality of life."  Tr. 318.  The record does not reflect that Plaintiff ever followed up on the physical therapy recommendation.  Within two weeks of the surgery, Plaintiff was "doing well . . . [s]table tinnitus and hearing."  Tr. 305.

The foregoing constitutes the record that was reviewed by state agency ("SA") experts initially and on reconsideration.  The administrative findings at the reconsideration phase (signed on June 3, 2020) note that any psychiatric impairment had been ruled out despite episodes of anxiety based on the report of Plaintiff's wife that anxiety had "completely resolved and he no longer has any anxiety now that the surgery is done."[3]  Tr. 83.  For medical limitations, the reconsideration phase SA expert, Dr. Henry Laurelli, noted that Plaintiff had hearing in the right ear but none in the left, as well as that, pre-surgery the "vertigo ha[d] resolved" and imbalance was stable, while within two weeks after the cholesteatoma was successfully removed, he was "doing well," with no dizziness, no nystagmus and stable tinnitus and hearing.  Tr. 83-84, 86 (referencing Tr. 270, 305-09).  Dr. Laurelli found that Plaintiff's statements regarding his

---

[3] This is corroborated by the record in that, until January/February 2021, when Plaintiff had a handful of therapy sessions with a social worker, the only mental health treatment appears to be medication for anxiety administered during the September 2019 hospitalization (Tr. 409) and during the March 2020 hospitalization (Tr. 311).  The medication appears to have been stopped when Plaintiff left the hospital.  Tr. 406, 410.  In addition, Plaintiff listed Sertraline (Zoloft) on his medication list, Tr. 230, but the only reference to it in a treating record indicates that Plaintiff cannot take Zoloft because it caused dizziness.  Tr. 64; see Tr. 47 (Plaintiff testifies that he was prescribed Zoloft not for anxiety but for tinnitus, but it was stopped after eight days because it caused dizziness).

symptoms were not substantiated by the objective medical evidence alone and opined that Plaintiff retained the residual functional capacity ("RFC")[4] to perform medium work with no climbing, occasional balancing and stooping, and the need to avoid exposure to workplace noise, vibration, hazards and heights.  Tr. 29, 84-86.  Dr. Laurelli's additional explanation specified that he "ha[d] created RFC based on hearing and vertigo issues."  Tr. 86.

After the reconsideration review was completed, Plaintiff continued treatment with Dr. Kozin.  In July 2020, Dr. Kozin noted that Plaintiff was "overall, . . . doing well" with "occasional dizziness."  Tr. 359.  In August, he observed that symptoms were "stable . . . some dizziness and fatigue, but i[s] improving."  Id.  And in November 2020, Dr. Kozin noted that Plaintiff was stable but "still has some dizziness and fatigue," as well as that he expressed concern that he was still out of work and "not having much progression."  Id.  Dr. Kozin recorded that Plaintiff "generally looks well," that recovery may take several months and up to a year and that Plaintiff likely has a left-sided vestibulopathy/hypofunction causing fatigue with anxiety "contributing."  Tr. 363.  Dr. Kozin again suggested physical therapy and a therapist to "allow him to cope."  Id.  Regarding follow up, Dr. Kozin advised Plaintiff to "contact me if symptoms worsen."  Id.

Weighing the evidence in this record and finding greater limitations than the SA experts had opined based on Plaintiff's testimony, the ALJ found that Plaintiff suffers from the severe impairments of cholesteatoma of the inner ear, mastoid with vertigo, tinnitus, and left-ear deafness but retains the RFC to perform light work as defined by 20 C.F.R. § 404.1567(b),

---

[4] RFC refers to "residual functional capacity."  It is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 416.945(a)(1).

except he can perform only occasional balancing and stooping, cannot climb ladders, ropes or scaffolds, is limited to working in areas of quiet noise, cannot work with vibratory tools, cannot work at unprotected heights or operate dangerous machinery, and cannot operate motor vehicles. Tr. 27-28.  Based on the testimony of the VE, the ALJ found that an individual with Plaintiff's RFC and vocational profile could perform the jobs of routing clerk, marker, and order clerk, which collectively comprise over 220,000 jobs in the national economy (after reduced by the 18% of these jobs that are part time).[5]  Tr. 31-32.  Accordingly, the ALJ found that Plaintiff is not disabled.  Tr. 32.

After the ALJ's decision issued on February 1, 2021, Plaintiff submitted additional medical records to the Appeals Council.  Tr. 2, 32.  For medical treatment, these included Dr. Smith's January 2021 record, which is ambiguous regarding whether vertigo was ongoing[6] but states that Plaintiff continued to have fatigue and that physical therapy might be advisable.  Tr. 64-66.  They also included a March 2021 record from Dr. Kozin that reflects Plaintiff's report that he still feels off balance and fatigued, similar to what appeared in Dr. Kozin's note from November 2020.  That is, Dr. Kozin continued to note that Plaintiff still complained of feeling off balance, fatigued and not making progress, continued to suggest that Plaintiff go to physical therapy and continued to advise that Plaintiff should "watch" and contact him if symptoms

---

[5] The ALJ's decision reflects a scrivener's numerical error in that he added in 224,000 jobs for "price marker," a job ruled out by Plaintiff's need for a quiet workplace, instead of 64,000 jobs for "routing clerk," which is clearly the intent of the decision.  Tr. 31-32, 57-59.  The correct number is the one reflected above in the text.  Plaintiff has not complained of this error and therefore has waived it as grounds for remand.  Rhonda F. v. Saul, C.A. No. 19-401JJM, 2020 WL 3470503, at *13 (D.R.I. June 25, 2020), adopted by Text Order (D.R.I. July 10, 2020).  Further, if raised, such an error would be harmless in that the ALJ still found over 200,000 available jobs, which is more than enough to sustain the Commissioner's burden.  Thomas P. v. Berryhill, C.A. No. 17-337 WES, 2018 WL 4629249, at *4 n.7 (D.R.I. Sept. 27, 2018) ("[u]nder any measure" more than 75,000 jobs is significant and suffices to satisfy the Commissioner's limited step-five burden).

[6] That is, Plaintiff's history of present illness included "continues to have vertigo," but on review of systems, no vertigo was reported.  Tr. 65.

worsen.  Tr. 20.  The submissions to the Appeals Council also included Plaintiff's first treatment

of record with a mental health specialist, in that Plaintiff had five therapy sessions with a social

worker in January and February 2021.  Tr. 2, 13-15, 37-40.  These difficult-to-read hand-written

notes reflect Plaintiff's intake statement that, "I can't work, I'm so upset," and the diagnosis of

depression and anxiety.  Tr. 39-40.  However, by the last therapy appointment on February 24,

2021, these notes reflect that Plaintiff had taken a trip to Daytona, was hopeful about physical

therapy and had been "told he could make significant progress."  Tr. 14.  Plaintiff failed to

appear for two appointments scheduled in March 2021.  Tr. 15.

In his function report dated December 7, 2019, Plaintiff subjectively described his

symptoms, including dizziness, lightheadedness and no energy, but with no report of tinnitus and

the ability to engage in personal care without limitation, to drive, to walk up to 1,000 feet, to lift

up to five pounds, to spend time with his wife and family and to attend "sports events – if I have

to choose."  Tr. 180-87.  Consistent with fewer limitations than those reflected in the function

report are the medical record's references, for example, that, pre-surgery, he went on a cruise

(albeit with dizziness); within two weeks post-surgery, he was "doing well," with "[s]table

tinnitus"; within four months post-surgery, he was "overall, . . . doing well," with "occasional

dizziness" and no reference to gait or walking issues; and, in 2021, he took a trip to Daytona.  Tr.

14, 281, 359-63.  In contrast, during his hearing testimony, Plaintiff stated that he experiences

ear buzzing ninety percent of the time that is sometimes so loud that it is difficult to hear out of

his right ear,[7] as well as that his gait is so impaired ("side to side") by vertigo that he can walk

---

[7] Despite this claim, during the hearing, Plaintiff testified that he is "okay with telephone talk" and that he was able to hear what was being said.  Tr. 47-48.

only with support and stand only briefly, that he uses a shower chair for personal care[8] and that he must lay down for fifteen to thirty minutes after walking for only two minutes.  Tr.  46-48, 54.

## II.   <u>Standard of Review</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019); <u>Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam).  In a Social Security case, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."  <u>Id.</u>

Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987); <u>see also</u> <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).  The determination of substantiality is based upon an evaluation of the record as a whole.  <u>Brown v. Apfel</u>, 71 F. Supp. 2d 28, 30 (D.R.I. 1999), <u>aff'd</u>, 230 F.3d 1347 (1st Cir. 2000) (per curiam); <u>see also</u> <u>Frustaglia v. Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987); <u>Parker v. Bowen</u>, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  <u>Brown</u>, 71 F. Supp. 2d at 30-31.  The Court does not reinterpret the evidence or

---

[8] Although Plaintiff's counsel devoted attention to the alleged inability to perform personal care functions both during the hearing and in the written presentation to this Court, Plaintiff himself contradicted his testimony about having a hard time with bathing and needing to use a shower chair, testifying that he "succeed[s] in standing [in the] shower" "[e]very day."  Tr. 54; <u>see</u> Tr. 181 (in function report, Plaintiff claims that he has "no problem" with personal care).

otherwise substitute its own judgment for that of the Commissioner.  Id. (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31.

If the Court finds either that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim, the Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g).  Allen v. Colvin, C.A. No. 13-781L, 2015 WL 906000, at *8 (D.R.I. Mar. 3, 2015).  If the Court finds that a judicial award of benefits would be proper because the proof is overwhelming, or the proof is very strong and there is no contrary evidence, the Court can remand for an award of benefits.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001).

## III.   **Disability Determination**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(i); 20 C.F.R. § 404.150.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.   **The Five-Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  20 C.F.R. §

404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Appendix 1, the claimant is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's

impairments do not prevent doing past relevant work, the claimant is not disabled.  20 C.F.R. §

404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past

work) prevent doing other work that exists in the local or national economy, a finding of disabled

is warranted.  20 C.F.R. § 404.1520(g).  The claimant bears the burden of proof at Steps One

through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267 F.

Supp. 2d 138, 144 (D. Mass. 2003).

### B.    Claimant's Subjective Statements

A reviewing court will not disturb a clearly articulated credibility finding based on

substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at 195.  Guidance in

evaluating the claimant's statements regarding the intensity, persistence and limiting effects of

subjective symptoms is provided by Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304,

at *3 (Oct. 25, 2017).  The ruling directs the ALJ to consider the entire case record, including the

objective medical evidence, the individual's statements, statements and other information

provided by medical sources and other persons, and any other relevant evidence, as well as

whether the subjective statements are consistent with the medical signs and laboratory findings.

Id. at *4-5.  As the First Circuit recently emphasized, in the absence of direct evidence to rebut a

claimant's testimony about subjective symptoms, such statements should be taken as true.

Sacilowski v. Saul, 959 F.3d 431, 441 (1st Cir. 2020); Tegan S. v. Saul, 546 F. Supp. 3d 162,

169 (D.R.I. 2021).  That is, if proof of disability is based on subjective evidence and a credibility

determination is critical to the decision, the subjective statements must either be explicitly

discredited or the implication of lack of credibility must be so clear as to amount to a specific

credibility finding.  Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995); Vanessa C. v. Kijakazi, C.A. No. 20-363MSM, 2021 WL 3930347, at *4 (D.R.I. Sept. 2, 2021), adopted, 2021 WL 8342850 (D.R.I. Nov. 2, 2021).

### C.    Other Work

Once the ALJ finds that a claimant cannot return to their prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  Seavey, 276 F.3d at 5.  In determining whether the Commissioner has met this burden, the ALJ must develop a full and fair record regarding the vocational opportunities available to a claimant.  Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989) (per curiam).  In cases where reliance on the Medical-Vocational Guidelines is not appropriate, the Commissioner's burden can be met through the use of a vocational expert.  Heggarty v. Sullivan, 947 F.2d 990, 996 (1st Cir. 1991); Thomas P. v. Kijakazi, C.A. No. 21-00020-WES, 2022 WL 92651, at *5 (D.R.I. Jan. 10, 2022), adopted by Text Order (D.R.I. Mar. 31, 2022).

## IV.    Background and Analysis

### A.    The ALJ's Treatment of Plaintiff's Subjective Statements

Plaintiff argues that remand is required because the ALJ failed to give proper credence to the subjective statements regarding his limitations that he made during his hearing testimony. He contends that this error resulted in an RFC that lacks critical limitations that would preclude work and that the ALJ's approach amounts to "an extreme insistence on objective medical findings to corroborate subjective testimony of limitation of function," in contravention of Avery v. Sec'y of Health & Hum. Servs., 797 F.2d 19, 22 (1st Cir. 1986), as well as that the ALJ disregarded Sacilowski, including its caution that "a claimant may have the capacity to engage in certain daily, 'home activities,' but still be unable to function in a workplace environment."

11

Sacilowski, 959 F.3d at 440 (citation omitted).  These arguments are unavailing because the

ALJ's analysis conforms with applicable law and is well supported by substantial evidence.

Most of Plaintiff's argument fails because it amounts to an invitation that the Court

should (improperly) reweigh the evidence.  See Vanessa C., 2021 WL 3930347, at *6.  For

example, in disregard of Purdy v. Berryhill, 887 F.3d 7, 11-17 (1st Cir. 2018) (affirming ALJ's

RFC based on claimant's statements in function report, rejecting claimant's hearing testimony as

lacking credibility), Plaintiff improperly criticizes the ALJ's appropriate reliance on the

information Plaintiff himself provided in his function report and to treating providers as

substantial evidence that contrasts with and directly rebuts Plaintiff's hearing testimony.  E.g.,

compare Tr. 180-87 (in function report, Plaintiff does not report tinnitus), and Tr. 237 (at

appointment with Dr. Smith, Plaintiff reports no tinnitus), with Tr. 48 (Plaintiff testifies that ear

buzzing is so severe that sometimes he cannot hear at all).  Similarly, Plaintiff argues that the

ALJ erred in failing to credit Plaintiff's testimonial claim that the March 2020 surgery simply

removed a growth and did not result in stabilization.  Tr. 49.  This argument asks the Court to

ignore that the ALJ appropriately relied on substantial evidence in medical records, as well as

Dr. Laurelli's expert analysis of those records.  Tr. 30 (citing, for example, Tr. 359, Dr. Kozin's

post-surgery notes: "He is doing well. . . . Stable tinnitus"; and "His symptoms are stable.  He

still has some dizziness and fatigue, but i[s] improving.").

Flawed for the same reason is Plaintiff's argument that the ALJ erred by failing to credit

his testimonial statement that vertigo prevents him from walking for more than two minutes.  Tr.

47, 54.  Plaintiff's problem is that the ALJ's approach is appropriately grounded on Plaintiff's

own statements in the function report (Plaintiff states he can walk without resting for "500 +

1,000 feet sometimes"), Tr. 185, as well as on the findings of the SA experts who deployed their

professional expertise to interpret the clinical observations, test results and other references in the record to find that the vertigo was "intermittent" and did not impact walking to the extent Plaintiff claimed. Tr. 84-85 (noting records reflecting "no vertigo" and "vertigo has resolved").

To save this argument, Plaintiff points to Dr. Kozin's 2021 note, generated after the ALJ issued his decision, that "[h]e may be experiencing persistent sense of imbalance and fatigue," Tr. 20, and argues that this reference contradicts the records relied on by the SA experts, vitiating them as substantial support for the ALJ's decision to discount the testimony. The argument is a non-starter as the foundation for an ALJ error in that the ALJ did not see these 2021 records. And when the Court looks past this deficiency to the merits of the argument, it is plain that none of the evidence submitted to the Appeals Council – neither Dr. Kozin's 2021 notation concerning ongoing imbalance nor Dr. Smith's 2021 notation concerning vertigo – is inconsistent with Dr. Laurelli's finding that Plaintiff did have ongoing vertigo but that it left him with the ability to walk and function at the medium exertion level with postural, communicative and environmental limitations. Tr. 65. Indeed, at that 2021 appointment, Dr. Kozin not only found that Plaintiff "generally looks well," but also made no observations about limitations on walking and concluded that no follow-up care was called for (other than reiterating the suggestion of physical therapy). Tr. 20. Similarly, while Dr. Smith noted a complaint of vertigo and the need for physical therapy, her survey of Plaintiff's current symptoms in January 2021 reflects "no vertigo, no tinnitus," with normal musculoskeletal system and no mention of issues with walking or gait. Tr. 64-66.

Also unavailing is Plaintiff's argument that the ALJ should not have considered the lack of persuasive medical opinions supporting the disabling limitations on walking that Plaintiff described in his testimony. This argument fails because the ALJ did consider the only opinion –

signed by Dr. Smith on November 6, 2019 – that arguably supports greater limitations.  Tr. 29, 239-40.  However, Dr. Smith opined to only mild limits on sitting and standing and cabined her conclusion that Plaintiff could not work due to significant walking limitations as applicable only until the surgery, which was performed just four months later.  Tr. 239-41.  Noting the durational problem with the Smith opinion, the ALJ appropriately found it to be unpersuasive.  Tr. 29. Plaintiff has not challenged this determination.

Consistent with the Smith opinion, the medical evidence reflecting walking difficulties falls into the period between the September 2019 episode until immediately following the March 2020 surgery.  Otherwise, the record is devoid of complaints by Plaintiff, clinical observations by treating sources and medical opinions supportive of significant walking limitations.  Compare Tr. 282 (Dr. Quesnel makes pre-surgery observation of gait issues), and Tr. 317-18 (on day following surgery, observation of gait issues to be addressed in physical therapy), with Tr. 16-21, 64-66, 305-09, 359-80 (at post-surgery appointments, no complaint or clinical observation of gait or walking issues), and Tr. 255-60 (on examination in 2017 and 2018, no complaint of gait abnormality and no reference to issues with walking, gait or balance).  The ALJ appropriately weighed this absence of evidence and supportably found that Plaintiff's extreme statements during the hearing should be discounted.  David H. v. Kijakazi, C.A. No. 21-333WES, 2022 WL 2816775, at *5 n.6 (D.R.I. July 19, 2022) (appropriate to consider that the "record does not contain a medical opinion that Plaintiff could not work"), adopted by Text Order (D.R.I. Sept. 13, 2022).  Also well supported is the ALJ's related finding that Plaintiff's gait limitations are limited to the period from the September 2019 episode until the March 2020 surgery.  Tr. 30.

At bottom, the ALJ complied with <u>Sacilowski</u>,[9] issuing a detailed decision that appropriately cites to evidence (accurately catalogued in the Commissioner's brief) that directly rebuts Plaintiff's testimonial statements, starting with Plaintiff's own statements in the function report, as well as the medical record, the medical opinions, Plaintiff's ongoing ability to race cars until the September 2019 episode and Plaintiff's medical stability following the March 2020 surgery.[10]  Further, the ALJ did not ignore Plaintiff's testimonial statements – to the contrary, the ALJ carefully considered his statements in determining that Plaintiff was more limited than the SA experts found him to be.  The ALJ's approach to Plaintiff's statements is not tainted by error.  I recommend that this aspect of his decision should be affirmed.

**B.      ALJ's Step Five Finding**

While the burden lies with the claimant for Steps One through Four, at Step Five the burden shifts to the Commissioner.  <u>Wells</u>, 267 F. Supp. 2d at 144.  Here, the ALJ sustained this burden by asking a VE to supply up to three representative jobs that a person with Plaintiff's RFC could perform.  Tr. 57.  The VE responded that a claimant with the limitations ultimately incorporated by the ALJ in his RFC could work at two light jobs and one sedentary job of which there are over 270,000 in the national economy, more than 220,000[11] if the part-time work is excluded.  <u>See</u> Tr. 31-32, 57-61.  During the hearing, the VE confirmed that her testimony was "consistent with the DOT and the SCO," and that her "job numbers" for the jobs to which she opined came from the "[OEQ]," which derive from the Bureau of Labor Statistics.  Tr. 60-61.

---

[9] In light of the ALJ's comprehensive support for his credibility finding, there is no need for the Court to consider the Commissioner's argument that <u>Sacilowski</u> improperly created a judicial presumption of credibility.

[10] Unseen by the ALJ, but corroborative of his finding of stability post-surgery is the 2021 record submitted to the Appeals Council reflecting that Plaintiff was able to take a "trip to Daytona," and was optimistic that the long delayed physical therapy would result in "significant progress."  Tr. 14.

[11] <u>See</u> n.5 *supra*.

On cross examination of the VE, Plaintiff confirmed that 18% of the gross number was part time, with the remainder full time.  Id. at 60.  Nothing in the record reflects any flaws or absence of reliability in the VE's methodology.

Citing a decision from the Seventh Circuit Court of Appeals, which ordered remand because the VE in that case had relied on the OEQ and testified to an incomprehensible and therefore unreviewable methodology for extracting the job numbers from OEQ data, Ruenger v. Kijakazi, 23 F.4th 760, 763 (7th Cir. 2022) (per curiam), Plaintiff argues that the VE's testimony in this case is insufficient to satisfy the Commissioner's Step Five burden.

In Ruenger, the Seventh Circuit was focused on an ongoing tension between that court and the Social Security Administration regarding the failure of the agency to procure more reliable and precise jobs data despite a project to do so that had been ongoing since 2008.  Id. at 762 ("this court continues to invite" the Social Security Administration "to replace the DOT with an updated publication").  Other circuits have similarly expressed discomfort with the agency's lack of definitive and up-to-date jobs data but have declined to remand solely on that basis because, unless a new source is created, the Commissioner's Step Five burden would become impossible to sustain.  Guiton v. Colvin, 546 F. App'x 137, 142 (4th Cir. 2013) ("[I]f we required a VE to produce job statistics specific to the DOT-coded occupations a claimant can perform, it is unlikely that the Commissioner would ever succeed in satisfying her burden.  This cannot be the result the regulations intend.") (emphasis in original); see Goode v. Comm'r of Soc. Sec., 966 F.3d 1277, 1284-85 (11th Cir. 2020) (as long as VE's testimony is not internally inconsistent and incomplete, "Social Security Act and its regulations do not mandate a precise count of job numbers.  And we do not expect vocational experts to formulate opinions with more confidence than imperfect data allows.") (citation omitted).

Plaintiff asks this Court to enter the debate regarding the OEQ data by ordering that this case must be remanded because a VE's use of the OEQ is *per se* insufficient, despite the lack of testimony revealing that the VE's methodology underlying the numbers for the specific jobs referenced in this case is flawed as Ruenger and Goode found in the unique circumstances presented in those cases.  Ruenger, 23 F.4th at 763-64; Goode, 966 F.3d at 1281-84.

To the extent that Ruenger supports a *per se* ban on any VE ever relying on the OEQ data, I decline to adopt such an approach.  As the Supreme Court cautioned in Biestek, 139 S. Ct. at 1157 ("[w]here [claimant] goes wrong, at bottom, is in pressing for a categorical rule"), such categorial rules are disfavored.  Indeed, Ruenger itself eschews such an approach.  Ruenger, 23 F.4th at 762 ("[w]e have never enjoined the use of the equal distribution method" used in the OEQ).  The only post-Ruenger decision in our Circuit to have considered the question rejected the adoption of such a sweeping categorical rule:

> [A]n ALJ can permissibly consider information from the OEQ.  Although the OEQ is not subject to administrative notice as a government source under 20 C.F.R. §§ 404.1560(b)(2), 404.1566(d, 416.960(b)(2), and 416.966(d), it is not excluded as a source for job information.  The regulations provide that ALJs can rely on "other publications" for such information.  20 C.F.R. §§ 404.1566(d), 416.966(d).  Moreover, the OEQ data is itself drawn from government census data.  Under 20 C.F.R. §§ 404.1560(b)(2), 404.1566(d), an ALJ is permitted to take judicial notice of Census Bureau reports.

Sharon W. v. Kijakazi, 2:21-cv-00287-NT, 2022 WL 2751645, at *5 (D. Me. July 14, 2022) (footnote omitted), adopted, 2022 WL 3042984 (D. Me. Aug. 1, 2022).

Alternatively, Plaintiff contends that Ruenger means that, once the record exposes that an ALJ is aware that the VE relied on OEQ data, this evinces a *per se* awareness of a potential deficiency in the data, so the ALJ must continue the examination to clarify, for example, "whether [the names of jobs] are different from [the standard occupation classification system] codes."  Ruenger, 23 F.4th at 764.  If the ALJ fails to do so, he "risk[s] shifting the agency's

evidentiary burden to the claimant."  Id.  Plaintiff argues that the ALJ's questioning of the VE about the source of her job numbers demonstrates that he must have been aware of Ruenger and concerned about its criticism of the OEQ data, which triggered a duty to dig deeper.

This argument fails for three reasons.

First, to remand based on the mere fact that the ALJ's questioning elicited from the VE the answer that, "I use the [OEQ]," Tr. 60, would effectively amount to finding that such use is *per se* reversible error, an approach that not only is contrary to Biestek but also is contrary to the First Circuit's decision in Wiley v. Colvin, No. 13-2473, 2015 WL 9653048 (1st Cir. Feb. 11, 2015), which states, "we take no position at this time on whether those numbers could satisfy the Commissioner's burden."  Id. at *2.  Second, as Purdy holds, at Step Five, the "[a]dmissibility of evidence before an ALJ presiding over Social Security proceedings is not subject to the Federal Rules of Evidence, and an ALJ is given express authority to assess the reliability of evidence offered."  Purdy, 887 F.3d at 15-16 (holding that Commissioner's burden is sustained as long as VE "testified that the job numbers were from the Bureau of Labor Statistics and were stated in reference to job descriptions in the DOT").  The VE's testimony here meets the Purdy standard in that she opined to specific jobs with specific numbers, confirming that a portion would be part time, and she testified that her opinion was "consistent with the DOT and the SCO," while her "job numbers" came from the OEQ and were derived from the Bureau of Labor Statistics.  Tr. 60-61.  There is nothing in this testimony reflecting that it lacked an adequately reliable foundation.  Therefore, the ALJ did not err in finding it reliable.  And third, Plaintiff's OEQ argument fails because it was waived by Plaintiff's failure to raise his challenge to the reliability of the VE's use of OEQ data before the ALJ.  Patricia B. v. Kijakazi, C.A. No. 20-424 WES,

2021 WL 5630028, at *2 (D.R.I. Dec. 1, 2021) (failure to challenge adequacy of VE testimony before ALJ waives a challenge before the District Court).

Based on the foregoing, as applicable in the circumstances of this case, I find that the VE's testimony was sufficiently reliable for the Commissioner to sustain her Step Five burden.  I do not recommend remand for a do-over of the Step Five determination.

### C.    The Appeals Council

Plaintiff submitted documents amounting to new evidence to the Appeals Council – these include new treating records from Dr. Kozin and Dr. Smith and hand notes from a social worker whom Plaintiff saw for therapy in January and February 2021.  Plaintiff contends that the Appeals Council committed an egregious mistake because it declined to exhibit the newly submitted evidence based on the finding, as to some of it, that it did not show a "reasonable probability that it would change the outcome of the decision" and, as to the remainder, that it did not relate to the period at issue.[12]  Tr. 2; see ECF No. 13 at 17-20.  Because I find that neither reason amounts to an egregious mistake, I do not recommend remand for further proceedings.

The Appeals Council must review a case if it receives "additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5).  When the Appeals Council denies review – as it did here – the already deferential substantial-evidence standard of review is supplanted by the exceedingly narrow egregious error standard.  Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001); Sullivan v. Saul, Civil Action No. 1:20-CV-11985-RW2, 2022 WL 3108850, at *3 (D. Mass. Aug. 3, 2022).  The Appeals Council's denial of review is afforded "a great deal of latitude" and "great deference."

---

[12] Plaintiff also submitted documents to the Appeals Council that had already been presented to the ALJ.  These are not in issue.  Tr. 2.

Mills, 244 F.3d at 5-6; David O. v. Berryhill, C.A. No. 18-17WES, 2019 WL 2501884, at *14

(D.R.I. Feb. 13, 2019).  In this context, egregious has been interpreted to mean "'[e]xtremely or

remarkably bad; flagrant.'"  Ortiz Rosado v. Barnhart, 340 F. Supp. 2d 63, 67 (D. Mass. 2004)

(quoting Black's Law Dictionary (7th ed. 1999)).

Focusing first on the new medical evidence, Dr. Smith's note from January 19, 2021,

reflects that Plaintiff continued to "have disequilibrium," is ambiguous regarding whether vertigo

was ongoing at all, and mentions no issue with walking or gait.  Tr. 65-66.  On examination, Dr.

Smith found "no objective tinnitus," with normal hearing in the right ear, no pain and

"[m]usculoskeletal [s]ystem strength and symmetry within normal limits."  Tr. 66.  She noted the

need to schedule Plaintiff for physical therapy.  Id.  This note appears entirely consistent with the

post-surgery records on which the ALJ did rely.  There is no error, never mind an egregious one,

in the Appeals Council's conclusion of no reasonable probability that this treating note would

change the outcome of the decision.

The other new medical record is Dr. Kozin's post-decision treating note of March 11,

2021.  Tr. 16-21.  This note duplicates much of what is reflected in Dr. Kozin's note of

November 19, 2020, (which the ALJ did see), including Dr. Kozin's recommendation to

"continue to watch and contact me if symptoms worsen."  Tr. 20, 363.  The only new material in

Dr. Kozin's 2021 record is the notation that "[h]e had an MRI at an outside institution that did

not show any concern for residual cholesteatoma" and that he "may be experiencing persistent

sense of imbalance."  Tr. 17, 20.  In addition to being outside the relevant time period, as the

Appeals Council correctly noted in declining review, the content of this note is substantially

similar to the treating record that preceded it and therefore does not give rise to a reasonable

probability that it would have changed the outcome of the decision.  Tr. 2.  Accordingly, remand

to consider it would be an empty exercise.  Gregory T. v. Berryhill, No. 1:17-cv-00445-LEW, 2018 WL 6012222, at *6 (D. Me. Nov. 16, 2018) ("remand is unwarranted in the absence of harmful error"), adopted, 2018 WL 6310056 (D. Me. Dec. 3, 2018).  There is no egregious mistake in the Appeals Council's declination to review the case based on Dr. Kozin's March 11, 2021, note.

The remaining new material consists of the hand-written therapy notes of a social worker who provided Plaintiff's first-ever mental health treatment (other than briefs stints of medication for anxiety during hospitalizations).  For the period prior to the ALJ's decision, these notes reflect an initial assessment resulting in a diagnosis of adjustment disorder with anxiety and depression due to Plaintiff's medical issues, followed by two appointments in January at which the social worker provided "supportive counseling" and noted goals of "explore working volunteering."  Tr. 37-40.  Of the two post-decision appointments, at one, Plaintiff told the therapist that he misses working and is prevented from working by dizziness (not mental health issues), while at the other, Plaintiff told the therapist he was back from a trip to Daytona, was optimistic about physical therapy and had been told he could make significant progress.  Tr. 13-14.  Plaintiff failed to appear for either of the two appointments scheduled in March.  Tr. 15.

Mindful that the ALJ did consider Plaintiff's anxiety at the RFC phase, noting that "barriers to progress may include anxiety," but also that Plaintiff "benefits from positive social supports, young age, motivation," Tr. 28, I find no egregious error or mistake in the conclusion of no reasonable probability that the social worker therapy notes from the January 2021 appointments would have changed the outcome of the ALJ's decision.  Nor is there an egregious mistake in the Appeals Council's determination that the social worker's therapy notes from the

two appointments in February 2021 relate to Plaintiff's status after the close of the relevant period; in any event, I find that, if considered, they would not change the outcome of the case.

Finding no egregious mistake by the Appeals Council, I recommend that the Commissioner's decision be affirmed.

## V.   <u>Conclusion</u>

Based on the foregoing, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 13) be DENIED and Defendant's Motion to Affirm the Commissioner's Decision (ECF No. 15) be GRANTED.   Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt.   <u>See</u> Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).   Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.   <u>See</u> <u>United States v. Lugo Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
November 30, 2022